Jose Klein, OSB No. 083845
jose@kleinmunsinger.com
Damien Munsinger, OSB No. 124022
damien@kleinmunsinger.com
KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F
Portland, OR 97214-3497
(503) 568-1078
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **HUNTER HAGEN**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**LIFESTANCE HEALTH, INC.**, a Delaware Corporation,<br><br>Defendant. | Case No.<br><br>**COMPLAINT**<br><br>1. Disability Discrimination (42 U.S.C. § 12112)<br>2. Disability Retaliation (Or. Rev. Stat. § 659A.109)<br>3. Disability Discrimination (Or. Rev. Stat. § 659A.112)<br><br>PRAYER: $750,000<br><br>DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1. Plaintiff Hunter Hagen ("Ms. Hagen" or "Plaintiff") was a dedicated and hardworking remote employee of LifeStance Health, Inc. ("LifeStance" or "Defendant"). Ms. Hagen suffered, and continues to suffer, from a gastrointestinal disorder which required frequent use of the bathroom. Until Defendant's implementation of strict employee monitoring software, Ms. Hagen was able to balance her condition and workload to LifeStance's satisfaction. However, upon learning the specifics of the new software, Ms. Hagan became fearful that it would discriminate against her based on her disability. As protected by Oregon and Federal law, Ms. Hagan disclosed her disability to LifeStance and sought a reasonable accommodation that would provide for unrestricted use of the bathroom. In response to Ms. Hagen's efforts, LifeStance discriminated against her, culminating in her termination on June 5, 2023.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331–1332, and 1367.

3. Venue is proper within the District of Oregon, Portland Division, pursuant to 28 U.S.C. § 1391(b) because all or substantially all of Plaintiff's claims arose in this judicial district and division. Venue is also proper because Defendant maintains an authorized representative for service within this judicial district and division.

4. Plaintiff timely filed a complaint with the Equal Opportunity Employment Commission and the Oregon Bureau of Labor and Industries about the misconduct described herein, and has received right-to-sue letters from both agencies, and has filed this Complaint within the respective time limits.

## PARTIES

5. Plaintiff Hunter Hagen is a resident and domiciliary of Multnomah County, Oregon.

6. Defendant LifeStance Health, Inc. is a foreign corporation organized under the laws of the state of Delaware doing business as LifeStance Health in Oregon. LifeStance is engaged in the business of behavioral healthcare. At all material times, LifeStance has had six or more employees or their full-time equivalents and is an "employer" within the meaning of Or. Rev. Stat. § 659A.001, 659A.106, and 42 U.S.C. § 12111.

## FACTUAL ALLEGATIONS

7. At all time material herein, Ms. Hagen suffered from a chronic gastrointestinal disorder ("gastrointestinal disorder" or "disorder" or "condition" or "disability") that required frequent visits to the bathroom. Ms. Hagen's condition affects major life activities, including but not limited to, sitting for uninterrupted periods of time and the operation of at least one major bodily function.

8. On or about June 27, 2022, LifeStance hired Ms. Hagen as a full-time Insurance Verification Specialist, with an hourly rate of $17.00.

9.  LifeStance hired Ms. Hagen as a 100% remote employee. For the duration of her employment at LifeStance, she worked out of her home in Multnomah County, Oregon.

10. Ms. Hagen's primary job duty for LifeStance included verifying that patients had the ability to pay LifeStance through active Oregon Health Plan insurance ("OHP"). She also reviewed emails and faxes sent to LifeStance's west coast operations team for insurance verification purposes. Ms. Hagen also provided some insurance verification duties for LifeStance's operations in Texas, and verified active insurance status for certain LifeStance customers who are veterans.

11. During her employment by LifeStance, Ms. Hagen's direct supervisor was Dionne Otto ("Ms. Otto").

12. In or about January 2023, Ms. Hagen performed her duties well, and was given a raise to $19.40 per hour and additional job responsibilities.

13. On or around February 2023, Ms. Otto tried to increase Ms. Hagen's workload. Ms. Hagen pushed back, responding that she was working at capacity and was not able to take on additional responsibilities and still perform at a sustainable level.

14. Ms. Hagen routinely worked overtime hours for LifeStance prior to Ms. Otto attempting to increase Ms. Hagen's workload.

15. In early 2023, Ms. Otto began informing groups of employees, including Ms. Hagen, that LifeStance would be implementing a new attendance point system and employee monitoring software ("audit logs"). The new systems

would install a more rigid attendance policy than had previously existed at LifeStance. At this point, LifeStance had never suggested to Ms. Hagen that there was any issue with her work performance.

16. Also in early 2023, Ms. Otto announced that she would meet with the insurance verification employees for one-on-one reviews to discuss the implementation of the audit logs, workloads, task completion, and job performance.

17. Ms. Otto never scheduled a one on one meeting with Ms. Hagen. Ms. Hagen understood this to mean that her performance was satisfactory.

18. In or around the beginning of February, 2023, LifeStance implemented the audit logs. Upon information and belief, the audit logs tracked employee screen time through the movement of their mouse. LifeStance used the audit logs in order to surveil employees' activities at their computers, apparently instituting a new requirement that employees be seated at their desk, moving their mouse, for long, uninterrupted periods of time.

19. Over the course of the first few months of 2023, Ms. Otto began emphasizing the importance of the audit log's data, sharing that LifeStance was using the data it produced as a metric for which to reprimand and terminate employees.

20. Prompted by a fear that the audit logs' data and administration could disadvantage her based on her disability, on or about April 6, 2023, Ms. Hagen reported her gastrointestinal disorder to Ms. Otto.

21. Ms. Otto immediately initiated a meeting with Ms. Hagen, wherein Ms. Hagen informed Ms. Otto that, due to her condition, she required frequent and

sometimes prolonged use of the bathroom. Ms. Otto responded that Ms. Hagen was indeed on a "watch list" due to time "gaps" in her audit logs. In response to Ms. Hagen's disability reporting, Ms. Otto promptly stopped the meeting to involve LifeStance Human Resources.

22. Upon information and belief, Ms. Otto stopped the meeting and got Human Resources involved because Ms. Otto likely understood that Ms. Hagen's disclosure potentially triggered some duty on the part of LifeStance to engage in an interactive process regarding reasonable accommodations.

23. Up until this point, Ms. Hagen had never received negative feedback about her work performance, project completion, target hitting, or dedication. To the contrary, Ms. Hagen had received positive feedback and had been able to balance her work and condition to perform her role satisfactorily.

24. In another meeting shortly thereafter ("reporting meeting"), Ms. Hagen met with Ms. Otto and LifeStance Human Resources representative Susan Conyers ("Ms. Conyers"). Pressured by Ms. Conyers and Ms. Otto's peppering of personal questions, Ms. Hagen made additional disclosures about the details of her disability and its requirements.

25. In the reporting meeting, Ms. Otto expressed skepticism that Ms. Hagen's condition was "real," and wondered that she was "really doing" when the audit logs indicated she was away from her computer. Ms. Otto stated that her time away was "not fair" to her colleagues and asked if Ms. Hagen would ever "get better" from her condition. Ms. Hagen responded that she had suffered from this condition

since she was a child and had endured many years of treatment. Ms. Hagen shared that her condition was permanent and that her flare ups were unpredictable in length and frequency.

26. Also in the reporting meeting, Ms. Hagen stated that she would be willing to send a message to her team every time she needed to step away from the computer to use the bathroom. Ms. Otto and Ms. Conyers responded that her suggestion was inappropriate. Instead, LifeStance instructed Ms. Hagen to just use her finite amount of Paid Time Off ("PTO") whenever her gastrointestinal disorder acted up.

27. At the end of the reporting meeting, Ms. Otto passive-aggressively told Ms. Hagen that she hoped she would "get better soon." Ms. Hagen reiterated that she had a chronic long-term condition that would not get better.

28. Ms. Hagen came away from the reporting meeting with the strong impression that Ms. Otto and Ms. Conyers did not believe what she had reported about her disabling condition and need for accommodation to use the restroom when required. Ms. Hagen felt the women regarded her and her needs as gross and inappropriate. These reactions coupled with the intensely private subject matter made Ms. Hagen feel exposed, embarrassed, and humiliated.

29. Ms. Otto's insincere well wishes, the suggestion that her requested accommodation was inappropriate, and the dismissive tone of the reporting meeting, all gave Ms. Hagen the impression that LifeStance's only satisfactory outcome would be for her disability to disappear.

30. In addition to LifeStance's discriminatory reaction to Ms. Hagen's disability reporting, Ms. Hagen's presence on a LifeStance watch list indicated that the audit log system had the effect of discriminating against her because of her disability and frequent need to use the bathroom.

31. Throughout the remainder of her employment at LifeStance, Ms. Hagen continued to suffer from her condition and endeavored to engage in an interactive process with LifeStance to no avail. Ms. Hagen also suffered from a heightened sense of despair and anxiety as a result of LifeStance's dismissive and discriminatory treatment.

32. Fearing further discrimination, on or about May 5, 2023, Ms. Hagen provided Ms. Conyers with a note from her doctor indicating that she has a gastrointestinal disorder and needed an accommodation of unrestricted use of the bathroom.

33. After submitting the note from her doctor, Ms. Hagen was not contacted by LifeStance regarding accommodation of her disability. LifeStance never provided Ms. Hagen with a path to rehabilitate her audit logs.

34. Due to mounting concern resulting from LifeStance's lack of interaction with her accommodation request, on or about May 8, 2023, Ms. Hagen followed LifeStance's procedures to submit a formal disability accommodations request through Prudential Group Insurance ("Prudential").

35. Also in or around May, 2023, LifeStance revoked Ms. Hagen's OHP assignment. LifeStance stated that she was being removed because she knew a

covered patient. Ms. Hagen remembered that previous employees had simply had familiar accounts blocked. However, LifeStance stated that blocking was impossible and insisted on removing her from OHP.

36. For the remainder of her employment at LifeStance, Ms. Hagen's assignment was put in limbo as some of her usual access was reduced and never restored. All of Ms. Hagen's attempts to gain clarity on her assignment were ignored.

37. On or about June 4, 2023, Prudential notified Ms. Hagen that they had received her doctor's medical certification submission.

38. On or about June 5, 2023, Ms. Hagen was summoned to a supposed "catch-up" meeting with Ms. Otto and Ms. Conyers ("termination meeting"). As soon as she joined the meeting, Ms. Hagen reminded the women that her doctor had submitted materials to Prudential as part of her ongoing accommodations request. In response, Ms. Otto and Ms. Conyers informed Ms. Hagen that she was being terminated.

39. During the termination meeting, Ms. Otto and Ms. Conyers indicated that Ms. Hagen was being let go because she did not have "proof" that she was in fact using the bathroom while she was away from the computer as supposedly indicated by the audit logs. Ms. Otto and Ms. Conyers then suggested that Ms. Hagen had poor communication and was "hard to work with."

40. Despite being aware of her disabling condition and request for accommodations, on or about June 5, 2023, LifeStance sent Ms. Hagen a letter confirming her termination. LifeStance cited "misrepresentation of time worked, lack

of communication on attendance, [and] noncompliance with coaching on communication expectations" as the reasons for her termination.

41. Ms. Hagen had never before been told she had communication issues or was "hard to work with."

42. Shortly after LifeStance terminated Ms. Hagen, she received notice from Prudential that her accommodation request had been "approved."

43. On or about July 21, 2023, the Oregon Employment Department denied Ms. Hagen's unemployment request, finding that Ms. Hagen had been fired from LifeStance "because [she was] not logging off from work when attending to medical needs."

44. Later, during a hearing regarding Ms. Hagen's unemployment benefits, the LifeStance representative admitted that she had no documentation regarding the reasons for Ms. Hagen's termination other than the audit logs.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Disability Discrimination – 42 U.S.C. § 12112**

45. Plaintiff realleges and incorporates all paragraphs above by reference as though fully set forth herein.

46. LifeStance is an employer as defined by 42 U.S.C § 12111(5)(A) and therefore a covered entity, under 42 U.S.C. § 12111(2), subject to federal prohibition of disability discrimination in employment.

47. Plaintiff exhausted her administrative remedies prior to bringing this claim, by filing complaints with the Oregon Bureau of Labor and Industries as well as the Equal Opportunity Employment Commission, and receiving letters informing her of her right to sue Defendant.

48. Plaintiff suffers from a physical or mental impairment that affects major life activities, including but not limited to, sitting for uninterrupted periods of time and the operation of at least one major bodily function

49. Plaintiff is a qualified individual, who could perform the essential functions of her job with or without an accommodation.

50. Plaintiff informed Defendant about her disability and requested accommodations.

51. Defendant discriminated against Plaintiff on the basis of her disability, including, but not limited to the following ways:

- Failing to accommodate Plaintiff's disability;
- Refusing to engage in a meaningful, ongoing interactive process to determine whether there was an accommodation that would allow Plaintiff to perform her duties;
- Utilizing methods of administration and employee screening that had the effect of discrimination on the basis of Plaintiff's disability;
- Suggesting that Plaintiff's disability and need for accommodation were feigned;
- Accusing Plaintiff of lying about her bathroom usage;

- Using the discriminatory audit log data as a basis for adversely impacting Plaintiff's employment;
- Terminating Plaintiff three-and-a-half months after she requested accommodations and one day after receiving her second doctor's letter;
- Terminating Plaintiff because of her disability; and
- Providing pretextual reasons for Plaintiff's termination.

52. Plaintiff's disability was a substantial, motivating factor behind Defendant's adverse treatment of Plaintiff.

53. As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer mental stress, emotional distress, humiliation, inconvenience and loss of enjoyment of life fair compensation for which to be determined at trial, but estimated to be not less than $750,000.

54. Defendant acted with knowledge and with malice or reckless indifference. Plaintiff requests an award of punitive damages.

55. Plaintiff is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from Defendant.

## SECOND CLAIM FOR RELIEF

### Disability Retaliation – Or. Rev. Stat. § 659A.109

56. Plaintiff realleges and incorporates all paragraphs above by reference as though fully set forth herein.

57. LifeStance is an employer as defined by Or. Rev. Stat. § 659A.001, subject to Oregon's prohibition of disability rights retaliation in employment.

58.     Plaintiff suffers from a physical or mental impairment that affects major life activities, including but not limited to, sitting for uninterrupted periods of time and the operation of at least one major bodily function

59.     Plaintiff is a qualified individual, who could perform the essential functions of her job with or without an accommodation.

60.     Plaintiff informed Defendant about her disability and requested accommodations.

61.     Defendant retaliated against Plaintiff because she invoked procedures related to her disability-rights.

62.     Defendant retaliated against Plaintiff in tenure, terms or conditions of employment, including but not limited to the following ways:

- Ignoring and sidelining Plaintiff after her disability reporting;
- Evaluating Plaintiff's job performance using discriminatory methods of administration and employee screening;
- Encouraging Plaintiff to exhaust her PTO instead of accommodating her disability;
- Subjecting Plaintiff to discriminatory treatment at the hands of LifeStance managers and supervisors;
- Reducing and never restoring Plaintiff's work access and responsibilities;
- Terminating Plaintiff three-and-a-half months after she requested accommodations and one day after receiving her second doctor's letter;

- Terminating Plaintiff because of her disability; and
- Providing pretextual reasons for Plaintiff's termination.

63. Plaintiff's disability was a substantial, motivating factor behind Defendant's adverse treatment of Plaintiff.

64. As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer mental stress, emotional distress, humiliation, inconvenience and loss of enjoyment of life fair compensation for which to be determined at trial, but estimated to be not less than $750,000.

65. Defendant acted with knowledge and with malice or reckless indifference. Plaintiff requests an award of punitive damages.

66. Plaintiff is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from Defendant.

## THIRD CLAIM FOR RELIEF

**Disability Discrimination – Or. Rev. Stat. § 659A.112**

67. Plaintiff realleges and incorporates all paragraphs above by reference as though fully set forth herein.

68. LifeStance is an employer as defined by Or. Rev. Stat. § 659A.106, subject to Oregon's prohibition of disability discrimination in employment.

69. Plaintiff suffers from a physical or mental impairment that affects major life activities, including but not limited to, sitting for uninterrupted periods of time and the operation of at least one major bodily function.

70. Plaintiff is a qualified individual, who could perform the essential functions of her job with or without an accommodation.

71. Plaintiff informed Defendant about her disability and requested accommodations.

72. Defendant Defendant discriminated against Plaintiff on the basis of her disability, including but not limited to the following ways:

- Failing to accommodate Plaintiff's disability;
- Refusing to engage in a meaningful, ongoing interactive process to determine whether there was an accommodation that would allow Plaintiff to perform her duties;
- Utilizing methods of administration and employee screening that had the effect of discrimination on the basis of Plaintiff's disability;
- Suggesting that Plaintiff's disability and need for accommodation were feigned;
- Accusing Plaintiff of lying about her bathroom usage;
- Using the discriminatory audit log data as a basis for adversely impacting Plaintiff's employment;
- Terminating Plaintiff three-and-a-half months after she requested accommodations and one day after receiving her second doctor's letter;
- Terminating Plaintiff because of her disability; and
- Providing pretextual reasons for Plaintiff's termination.

73. Plaintiff's disability was a substantial, motivating factor behind Defendant's adverse treatment of Plaintiff.

74. As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer mental stress, emotional distress, humiliation, inconvenience and loss of enjoyment of life fair compensation for which to be determined at trial, but estimated to be not less than $750,000.

75. Defendant acted with knowledge and with malice or reckless indifference. Plaintiff requests an award of punitive damages.

76. Plaintiff is entitled by statute to recover her reasonable attorneys' fees, expert fees, costs and disbursements from Defendant.

## JURY TRIAL DEMAND

77. Plaintiff demands a jury trial on all claims and issues triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Assume jurisdiction over each of the claims set forth herein;

2. Issue a declaration that Defendant has violated Plaintiff's legally protected rights, and an order requiring Defendant to correct this deficiency;

3. Grant equitable relief including but not limited to an expungement of all negative references or allegations of performance deficiencies that may be in Plaintiff's personnel file, and reinstatement Plaintiff to her former position including any promotions she would have been eligible for but for Defendant's unlawful conduct;

4. Order Defendant to pay Plaintiff an award of compensatory damages for emotional damages, including undue humiliation, fear, stress, embarrassment, and a loss of enjoyment of life, in an amount to be determined by a jury;

5. Order Defendant to pay Plaintiff an award for punitive damages for acting with knowledge and with malice or reckless indifference;

6. Award Plaintiff Plaintiff's costs of suit and reasonable attorney fees, costs, and expert witness fees;

7. Order Defendant to provide Plaintiff with additional financial consideration sufficient to offset any and all tax penalties or increased tax burdens Plaintiff would have avoided but for Defendant's unlawful treatment of Plaintiff, or arising from Plaintiff's financial recovery from Defendant;

8. Order Defendant to pay prejudgment and post-judgment interest, as appropriate, on all above amounts due to Plaintiff as a result of this action;

9. Grant a permanent injunction enjoining Defendant, its officers, management personnel, employees, agents, successors, and assigns, and all persons in active concert or participation with Defendant, from engaging in any employment practice which discriminates against employees with legally protected characteristics;

10. Grant a permanent injunction enjoining Defendant, its officers, management personnel, employees, agents, successors, and assigns, and all persons in active concert or participation with Defendant, from providing any false, malicious, defamatory, or misleading information in response to any reference check performed by any potential future employer of Plaintiff;

//
//
//

11. Order Defendant to create, implement, and carry out policies, practices, and programs providing for equal employment opportunities which affirmatively eradicate the effects of past and present unlawful employment practices, on such terms as the court may direct; and

12. Any other relief the Court deems just and equitable.

DATED: November 25, 2024

                                                            KLEIN MUNSINGER LLC

                                                    By: *s/ Damien Munsinger*
                                                         Jose Klein, OSB No. 083845
                                                         jose@kleinmunsinger.com
                                                         Damien Munsinger, OSB No. 124022
                                                         damien@kleinmunsinger.com
                                                         Attorneys for Plaintiff